UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LATAUSHA SIMMONS,

      Plaintiff,

v.

HENRY FORD HEALTH
SYSTEM, *et al.*,

      Defendants.

Case No. 4:18-cv-14058
Honorable Matthew F. Leitman
Magistrate Judge Elizabeth A. Stafford

## REPORT AND RECOMMENDATION ABOUT DEFENDANTS' DISPOSITIVE MOTIONS [ECF NOS. 66, 68, 71]

### I.    Introduction

Plaintiff Latausha Simmons sues Henry Ford Health System (HFHS), a HFHS medical provider, and various HFHS security officers, alleging that they violated her constitutional rights and committed common law torts against her.  ECF No. 21.  The Honorable Matthew F. Leitman referred the case to the undersigned for all pretrial matters under 28 U.S.C. § 636(b)(1). ECF No. 9.

Pending before the Court are three motions by defendants: a motion for partial dismissal of time-barred claims, a motion to dismiss Defendant Jennifer Pelzer-Jones, and a motion to dismiss Simmons's 42 U.S.C.

§ 1983 claims.  ECF No. 66; ECF No. 68; ECF No. 71.  The Court recommends:

- That ECF No. 66 be **GRANTED IN PART AND DENIED IN PART**, causing the dismissal of Simmons's assault, battery, and defamation counts (Counts VI-VIII);

- That ECF No. 71 be **GRANTED IN PART AND DENIED IN PART**, causing the dismissal of the § 1983 claims against HFHS and Dr. Pelzer-Jones;

- That ECF No. 68 be **GRANTED**, causing the dismissal of the remaining claims against Pelzer-Jones; and

- That Counts III and XIII be **DISMISSED SUA SPONTE** under 28 U.S.C. § 1915(e).

## II.   Background

Simmons's complaint includes claims of false arrest, false imprisonment, conspiracy, intentional infliction of emotional distress (IIED), negligent infliction of emotional distress (NIED), defamation, assault, battery, excessive force, sexual assault, sexual and racial discrimination under federal and state law, violation of HIPAA privacy laws, negligence and gross negligence, and violations of the Fourth and Fourteenth

2

Amendments.  ECF No. 21.  These claims stem from alleged incidents at an HFHS hospital on August 30, 2016.  *Id.*, PageID.95.

Simons alleges that she sought emergency room treatment but that hospital staff "placed male and non-African American female patients before [her]," and she waited "over 2 hours in pain."  *Id.*  After seeing a doctor and receiving several doses of pain medication intravenously, Simmons's "pain persisted and [she] made repeated requests to be seen and treated by a neurologist during her ER visit."  *Id.*, PageID.96.  The doctor "told [Simmons] that she had to go to the neurology department herself to set an appointment," and she alleges that his "refusal to have a neurologist examine [her] during her ER visit caused her cervical spine injury, cervical stenosis, bulging and herniated discs in her spine, which were attributing to her right head pain and headaches to go undiagnosed." *Id.*

Dr. Jennifer Pelzer-Jones, a psychologist, then visited Simmons in the emergency room.  *Id.*, PageID.97.  When Simmons repeatedly asked to be seen by a neurologist, Pelzer-Jones allegedly responded "that if you think you are going to go through me to get to a neurologist, you got another thing coming."  *Id.*  Simmons alleges that Pelzer-Jones "intentionally deceived and misled" her and "had accessed and obtained

3

[her] medical information unlawfully under the ruse of her being a medical doctor." *Id.*, PageID.97-98.  She claims that Pelzer-Jones then "through unlawful and unauthorized means gained entry into Defendant HFH computerized patient records system and accessed and obtained [Simmons's] personal and medical health information, in violation of her patient privacy rights and HIPAA privacy laws." *Id.*, PageID.98.

After Pelzer-Jones allegedly "harass[ed], intimidate[d]…and prevented" Simmons from receiving further medical care, the doctor discharged her and "only instructed her to follow up directly with [the neurology department]." *Id.*, PageID.99.  She claims that, despite her requests, the doctor, nurse, and the HFH staff "refused" to "go over the discharge documents which included a prescription for pain, and any blood work performed." *Id.*  Pelzer-Jones then allegedly "told staff not to assist [Simmons] during her discharge and with her documents," and the ER nurse told Simmons "we are calling security to get you out of here." *Id.*, PageID.99-100.  Simmons alleges that defendants refused to allow her to change her clothes in privacy. *Id.*, PageID.100.

HFHS security police officers then allegedly approached Simmons, and she explained that she needed assistance with her discharge documents and was "refused any and all further medical assistance." *Id.*

4

She claims that Pelzer-Jones told the security officers "and all others within 'earshot'" about her "HIPAA protected medical information" in violation of her rights.  *Id.*  The security officers then "escorted her out of the ER department half dressed" and into the ER lobby.  *Id.*

After requesting to speak with HFHS administration, Simmons met with the director of the ER department, was escorted to the elevators for the neurology department, and spoke to the assistant director of neurology. *Id.*, PageID.101-104.  HFHS security police officers allegedly appeared and stated that they "were told that [she] had a complaint with security" and they told her "to file a complaint in writing."  *Id.*, PageID.103.  The officers allegedly "called her out of the room," told staff to deny her assistance, told the medical staff that Simmons "must prove…that she had $125.00 to even continue a conversation with any medical staff in the neurology department," and called for more security officers.  *Id.*, PageID.103-104.

Simmons then went to the restroom and after "only 10 minutes or less of [her] entering the restroom," a female security officer allegedly opened the restroom, stated that "it don't take this long to use the bathroom," and looked under the stall.  *Id.*, PageID.105.  Simmons claims that a few security officers "blocked [her] from further use of the amenities" and that the female security officer "physically grabbed [Simmons] by her breasts"

and "between her thighs and began to drag [her] from the restroom." *Id.*
The security officers then allegedly followed Simmons to the elevator and
"badgered" her to sit in a wheelchair. *Id.*, PageID.106. Upon exiting the
elevator, the security officers "surrounded" Simmons, "intentionally blocked
her path of direction," and "refused her access" to the pharmacy to fill her
prescription. *Id.*, PageID.106-107.

But Simmons spoke to the pharmacy staff about her prescription
anyway, and afterwards, the security officers "refused to allow [her] to go to
the…main lobby" to use the phone, "prevented her from walking," and
"physically violently 'hit' [her] across the chest." *Id.*, PageID.107-108. One
officer allegedly told another to arrest Simmons, and the officers "snatched
[her] walking cane away, grabbed [her] in front of patients," and arrested
her. *Id.*, PageID.109. They allegedly "pushed [her] head down," "forced
her to bend over," twisted her arms, handcuffed her, used a camera to take
photos of her being arrested, and then "paraded" her through the hospital
"in front of patients." *Id*. Simmons claims that the security guards then
"dragged" her from the building and forced her down a flight of stairs,
causing her to sustain left foot and ankle injuries. *Id.*, PageID.109-110.

Simmons alleges that the security officers "dragged [her] to a holding
cell and forced her inside," exposed her breasts by ripping off her shirt, and

6

handcuffed her to a steel bench.  *Id.*, PageID.110-111.  She claims that

they "unlawfully searched and seized [her] property" around "five o'clock in

the evening" and left her locked in the cell "without any excess to food,

water, toilet facilities or means of contacting anyone, for 7 to 8 hours, until

the next day."  *Id.*, PageID.111.  Simmons also alleges the security officers

released her to Detroit Police after midnight.  *Id.*, PageID.112.  She

complains that she was "falsely imprisoned" by the security officers "upon

no charges" and that she sustained several injuries—including "emotional

trauma"—from the incident.  *Id.*

### III.  Analysis

### A.

Defendants refer to their motions as being for "summary judgment,"

but rather than relying on the rule for summary judgment motions, Federal

Rule of Civil Procedure 56, defendants cite Federal Rule of Civil Procedure

12(b)(6) and (c).  A motion for judgment on the pleadings under Rule 12(c)

is governed by the same standards applicable to a motion to dismiss under

Rule 12(b)(6).  *Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007)

("[T]he legal standards for adjudicating Rule 12(b)(6) and Rule 12(c)

motions are the same[.]").

A motion to dismiss under 12(b)(6) tests a complaint's legal sufficiency.  *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir. 1993).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The *Iqbal* Court explained, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  In deciding whether a plaintiff has set forth a "plausible" claim, the Court must construe the complaint in the light most favorable to the plaintiff and accept as true all well-pleaded factual allegations.  *Id*.

Pleadings filed by pro se litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers, but such complaints still must plead a plausible claim for relief.  *Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007); *Davis v. Prison Health Services*, 679 F.3d 433, 437-38 (6th Cir. 2012).  If "a cause of action fails as a matter of law, regardless of whether the plaintiff's factual allegations are true," the Court must dismiss it.  *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009).

**B.**

Defendants assert in their first motion that several of Simmons's claims are barred by the statute of limitations.  ECF No. 66.  But defendants cite the counts of Simmons's December 2018 complaint, overlooking her July 2019 amended complaint.  *Id*.; ECF No. 21.  And defendants rely on statutes of limitations under Michigan law without properly addressing whether those statutes apply.  ECF No. 66, PageID.721-729.

To find the applicable statute of limitations, the Court must assess whether each claim is asserted under federal or state law.  In Counts I and II, Simmons makes claims, including false arrest and false imprisonment, under 42 U.S.C. §§ 1983, 1985, and 1988.  ECF No. 21, PageID.113-116.  Count III claims conspiracy to accomplish an unlawful purpose without identifying an underlying actionable tort or stating whether it is brought under federal or state law.  *Id*., PageID.116-117; *Detroit Will Breathe v. City of Detroit*, 524 F. Supp. 3d 704, 710 (E.D. Mich. 2021) (stating that civil conspiracy claim requires allegation of underlying actionable tort).  Simmons cited Michigan common law for Count IV, alleging IIED.  ECF No. 21, PageID.117-118.  She does not state the source of her claims of NIED or defamation (Counts V and VI) but those are causes of action under

9

Michigan law.  *Id*., PageID.118-119; *Fisher v. Lindauer*, 904 F. Supp. 2d

750 (W.D. Mich. 2012) (addressing NIED); *Ealy v. Diorio*, No. 3:09CV052,

2009 WL 545106, at *2 (S.D. Ohio Mar. 3, 2009) (addressing defamation).

Simmons's assault, battery, sexual assault, Elliott-Larsen Civil Rights Act

(ELCRA), negligence and gross negligence counts all appear to have been

made under state law (Counts VII, VIII, X, XII, and XIV), while she stated

her excessive force, and sex and race discrimination claims (Count IX and

XI) under §§ 1983, 1985, and 1988.  ECF No. 21, PageID.120-124, 130-

134.  Count XIII makes claims under the federal Health Insurance

Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d-6.

*Id*., PageID.128-130.  Finally, Count XV claims violations of the Fourth and

Fourteenth Amendments, which are actionable under § 1983.  *Id*.,

PageID.133-134; *Gregory v. City of Louisville,* 444 F.3d 725, 749 (6th Cir.

2006).

     The Court has supplemental jurisdiction over Simmons's state law

claims.  28 U.S.C. § 1367(a) ("the district courts shall have supplemental

jurisdiction over all other claims that are so related to claims in the action

within such original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution").  Michigan

law controls the statute of limitations for Simmons's supplemental state law

claims. *Bradford v. Bracken Cty*., 767 F. Supp. 2d 740, 746 (E.D. Ky. 2011).

In their motion, defendants cite Simmons's initial complaint and argue that Simmons's false arrest, false imprisonment, sexual assault, assault and battery, IIED, NIED, defamation, and invasion of privacy claims are time-barred. ECF No. 66, PageID.721-722. They are right that, under Michigan law, a two-year statute of limitations applies to assault and battery, and a one-year limitation applies to Simmons's defamation claim. M.C.L. § 600.5805(3) & (11); *Nichols v. Moore*, 334 F. Supp. 2d 944, 948 (E.D. Mich. 2004). But a three-year statute of limitations applies to her IIED and NIED claims. *Jewel v. Chrysler, LLC*, No. 13-14268, 2014 WL 764660, at *5-6 (E.D. Mich. Feb. 25, 2014). And the statute of limitations for Simmons's sexual assault claim is ten years. M.C.L. § 600.5805(6).

Defendants are also wrong when they argue that the statute of limitations for Simmons's false arrest and false imprisonment claims is two years. ECF No. 66, PageID.721-722. Those claims are filed under § 1983 claims, and the three-year Michigan "statute of limitations governing actions for personal injury" applies to actions filed under § 1983. *Drake v. City of Detroit, Michigan*, 266 F. App'x 444, 448 (6th Cir. 2008) (citing § 600.5805). Finally, the only invasion of privacy claim in Simmons's second amended

11

complaint is under HIPAA, but that statute did not create a private right of
action. *Thomas v. Dep't of Health & Hum. Servs., Off. for C.R.*, No. 17-
6308, 2018 WL 5819471, at *2 (6th Cir. Aug. 24, 2018).

The claims that defendants did not address in their motion are
governed by Michigan's three-year personal injury statute of limitations.
§ 600.5805(2); *Drake*, 266 F. App'x at 448 (§ 1983 claims); *Jewel*, 2014
WL 764660 at *5-6 (Elliot-Larsen claims); *Dabish v. McMahon*, 818 F.
App'x 423, 427 (6th Cir. 2020) (civil conspiracy and gross negligence);
*Bellamy v. Target Stores*, No. 235334, 2002 WL 31934019, at *2 (Mich. Ct.
App. Nov. 19, 2002) (negligence).

Each state law claim accrued "at the time the wrong upon which the
claim is based was done regardless of the time when damage result[ed]."
M.C.L. § 600.5827.  Federal law governs when the § 1983 claims accrue.
*Eidson v. State of Tennessee Dep't of Children's Servs*., 510 F.3d 631, 635
(6th Cir. 2007).  "Ordinarily, the limitation period starts to run when the
plaintiff knows or has reason to know of the injury which is the basis of his
action."  *Id*.  Under these standards, Simmons's claims accrued on August
30, 2016—the date of the alleged incidents.  ECF No. 21.  She first filed her
state claims in state court in August 2018 but voluntarily dismissed them.
ECF No. 70, PageID.757.  She then filed her claims in federal court on

December 27, 2018, after the statute of limitations for her assault, battery, and defamation claims. ECF No. 1.

But Simmons asserts that because she filed her claims in state court in August 2018, the statutory periods were tolled before her federal court filing. ECF No. 70, PageID.757. She says that she "had understandable confusion about the legal nature of her federal claims in state court" and that equitable tolling and the equitable estoppel doctrine apply. *Id.*, PageID.757-758, 775. Her arguments lack merit.

State tolling doctrine governs state claims. *Roberson v. Macnicol*, 698 F. App'x 248, 250 (6th Cir. 2017). Michigan law applies equitable tolling only in limited and extraordinary circumstances. *Siner v. City of Detroit*, 15-cv-13532, 2017 WL 3434085, at *3 (E.D. Mich. Aug. 10, 2017).

> Michigan recognizes the doctrine of equitable tolling, and that a plaintiff may obtain relief from a statute of limitations thereunder if the delay in filing is the product of an understandable confusion about the legal nature of her claim, that confusion is created by the courts themselves, and the delay does not result simply from the plaintiff's lack of diligence. Moreover, where a specific statute controlling the period of limitation is found to abrogate the common law, courts must resort to the statutory tolling rules.

*Kucharski v. Leveille*, 526 F. Supp. 2d 768, 772-73 (E.D. Mich. 2007). This case does not qualify for equitable tolling under Michigan statutory or common law. Simmons does not assert that defendants tried to conceal

13

their conduct.  *See* M.C.L. § 600.5855 (permitting action to be filed two years after person discovers existence of claim that defendant fraudulently concealed).  And Simmons does not show that the courts created any confusion.  Instead, her delay in filing her federal action four months after she dismissed her state court case resulted solely from her lack of diligence.

Simmons cites 28 U.S.C. § 1367(d) as providing that the limitations period for a state claim is "tolled while the claim is pending and for a period of 30 days after it is dismissed."  ECF No. 70, PageID.780.  But § 1367(d) stops the clock for state claims only while they are pending in *federal court* under supplemental jurisdiction.  *Artis v. D.C.*, 138 S. Ct. 594 (2018). Section 1367(d) comes into play under two circumstances: (1) when district courts "dismiss all claims independently qualifying for the exercise of federal jurisdiction" and thus dismiss "all related state claims" under § 1367(c)(3); or (2) when district courts decline to exercise supplemental jurisdiction.  *Artis*, 138 S. Ct. at 597-98.  Section 1367(d) "suspends the statute of limitations for two adjacent time periods: while the claim is pending in federal court and for 30 days postdismissal."  *Id*. at 603.  It does not, as Simmons argues, suspend the statute of limitations while claims are pending in state court.

14

For these reasons, defendants' motion for judgment on the pleadings (ECF No. 66) should be granted as it relates to Simmons's claims of defamation (Count VI), assault (Count VII), and battery (Count VIII).

**B.**

Two counts of Simmons's amended complaint should be dismissed sua sponte because she is proceeding in forma pauperis and those counts fail to state a claim.  ECF No. 4; 28 U.S.C. § 1915(e) ("the court shall dismiss the case at any time if" the action "fails to state a claim on which relief may be granted.").  Simmons's Count III should be dismissed because it claims conspiracy without identifying an underlying actionable tort.  *Detroit Will Breathe*, 524 F. Supp. 3d at 710.  And Count XIII should be dismissed because HIPAA did not create a private right of action.  *Thomas*, 2018 WL 5819471, at *2.

**C.**

In another motion, defendants move for dismissal under Rule 12(b)(6), arguing that defendants were not state actors and thus not liable under § 1983.  ECF No. 71.  The Court first notes that defendants' motion, if granted, would warrant only partial dismissal because some of Simmons's claims are not filed under § 1983.  As noted, Simmons made claims for IIED, NIED, sexual assault, violations of Elliott-Larsen,

15

negligence, and gross negligence under state law.  ECF No. 21,

PageID.117-119, 124-125, 127-128, 130-133.

For Simmons to prevail on her § 1983 claims, she must establish that

a (1) person acting under color of state law (2) deprived her of a right

secured by the Constitution or laws of the United States.  *Waters v. City of*

*Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001).  "Section 1983 is

generally not implicated unless a state actor's conduct occurs in the course

of performing an actual or apparent duty of his office, or unless the conduct

is such that the actor could not have behaved as he did without the

authority of his office."  *Id.* at 359.  When the defendant is a private party,

the "state action" element of a § 1983 claim turns on "whether the party's

actions may be fairly attributable to the state."  *Wolotsky v. Huhn*, 960 F.2d

1331, 1335 (6th Cir. 1992).  To identify those actions that are attributable to

the state, the Supreme Court has formed three tests: "(1) the public

function test, (2) the state compulsion test, and (3) the symbiotic or nexus

test."  *Lindsey v. Detroit Ent., LLC*, 484 F.3d 824, 828 (6th Cir. 2007)

(internal quotation marks and citations omitted).

The only test relevant here is the public function test.  Under the

public function test, a private entity performs a "public function" if it

exercises "powers traditionally exclusively reserved to the State," such as

16

holding elections, operating a privately-owned town, or establishing a privately-owned municipal park. *Id.* (internal quotation marks and citations omitted).

The Court begins its analysis by addressing the defendants who are HFHS private security officers. Private security guards who are endowed by law with plenary police powers may qualify as state actors under the public function test. *Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005). "When the state delegates a power traditionally reserved to it alone—the police power—to private actors so that they can provide police services to institutions that need it, a plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected." *Id.* (internal citations and quotation marks omitted) (brackets added in *Romanski*).

The private security officers in *Romanski* were "*de facto* police officers" who qualified as state actors because they were licensed under Michigan law by Michigan's department of police to arrest people without a warrant, and thus "endowed with plenary police powers." *Romanski*, 428 F.3d at 637-38 (citing M.C.L. §§ 338.1067, 338.1069, 338.1079 & 338.1080). The *Romanski* court distinguished the facts before it from opinions holding that security officers were not state actors, noting that the security officers in the other cases had no power to arrest, while the

17

Michigan statute "includes no qualitative limits on that power."  *Id.* at 639-40.

Defendants here acknowledge that HFHS private security officers had the authority to arrest and carry handguns under § 338.1080.  *See* ECF No. 71, PageID.806-807.  They argue that the officers' powers were limited to when they were on duty.  *Id.*, PageID.807.  But that fact does not distinguish this case from *Romanski*, which found it "critical" that the defendant was on duty at all relevant times, leading "to an inescapable conclusion of law—namely, that at all times relevant to this case, [the defendant] 'ha[d] the authority to arrest a person without a warrant as set forth for public peace officers....'"  *Romanski*, 428 F.3d at 638 (quoting § 338.1080).

Defendants correctly note that a district court opinion published before *Romanski* found that "[t]he limited powers conferred under [§ 338.1080] do not convert private security guards into state actors."  *Smith v. Detroit Ent. L.L.C.*, 338 F. Supp. 2d 775, 780 (E.D. Mich. 2004).  But this Court must follow *Romanski*.  "[T]here is a rule of law about published Sixth Circuit opinions: they are controlling binding precedent for future Sixth Circuit panels and for all district courts in the circuit."  *Chinn v. Jenkins*, No. 3:02-CV-512, 2018 WL 488159, at *4 (S.D. Ohio Jan. 19, 2018); *see also*

*In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013) ("Where our circuit has answered the question, the district court is bound by our published authority.").

Under *Romanski*, the HFHS security officers were state actors.

**D.**

Defendants also contend that Dr. Pelzer-Jones and HFHS cannot be held liable under § 1983.  ECF No. 71, PageID.801.  The Court agrees because Dr. Pelzer-Jones and HFHS are not state actors and thus not liable under § 1983.  *Scott v. Ambani*, 577 F.3d 642, 649 (6th Cir. 2009) (finding that a doctor was not a state actor because there was no contractual relationship between the doctor and the state).

Simmons argues that the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, renders HFHS and its doctors state actors.  ECF No. 79, PageID.948.  But a judge in this district "emphatically" rejected an argument that the EMTALA creates state-actor status.  *Price v. Doe*, No. 19-10348, 2019 WL 5538113, at *2 (E.D. Mich. Oct. 25, 2019) (Goldsmith, J.).  "[A] hospital's obligation to provide emergency medical assistance to those in need—imposed on hospitals accepting Medicare funding through the [EMTALA]—does not render the hospital a state actor

19

for § 1983 purposes."  *Id*. (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)).

## E.

In a separate motion filed on behalf of Dr. Pelzer-Jones, defendants argue that Simmons failed to state actionable claims.  ECF No. 68, PageID.744-745.  The remaining claims against Pelzer-Jones include IIED, NIED, sex and race discrimination under ELCRA, and negligence and gross negligence.[1]  *See* ECF No. 21; ECF No. 75.  Simmons claims that Pelzer-Jones "intentionally deceived and misled" her and "accessed and obtained [her] medical information unlawfully under the ruse of her being a medical doctor."  ECF No. 21, PageID.97-98.  Pelzer-Jones allegedly "harass[ed], intimidate[d]…and prevented" Simmons from receiving any further medical care and "told staff not to assist [Simmons] during her discharge and with her documents."  *Id*., PageID.99-100.  Simmons—who was still in a hospital gown—claims that Pelzer-Jones then refused to allow

---

[1] The Court agrees with Simmons that her claims do not sound in medical malpractice.  ECF No. 75, PageID.879.  While Simmons's interactions with Pelzer-Jones arose "within the course of a professional relationship," the alleged disclosure of Simmons's medical information does not "raise questions involving medical judgment."  *See Stratton v. Krywko*, No. 248669, 2005 WL 27522, at *13 (Mich. Ct. App. Jan. 6, 2005) ("If the reasonableness of the health professionals' action can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence.") (citations omitted).

her to change clothes in privacy and shared her "HIPAA protected medical information" with the security officers and "all within 'earshot.'" *Id*., PageID.100.

Simmons fails to allege facts sufficient to state an IIED claim. "To set forth a claim for IIED under Michigan law, a plaintiff must show extreme and outrageous conduct, intent or recklessness, causation, and severe emotional distress." *Brent v. Wayne Cty. Dep't of Hum. Servs.*, 901 F.3d 656, 678 (6th Cir. 2018). "Such conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id*., (citations and internal quotation marks omitted). In *Brent*, the court dismissed an IIED claim because the plaintiff's complaint did not allege that the defendant did anything "extreme and outrageous" or "for the purposes of inflicting severe emotional distress." *Id.* The same is true here. Simmons's allegations against Dr. Pelzer-Jones do not describe extreme or outrageous treatment or that she did anything for the purpose of inflicting severe emotional distress.

Simmons also does not state a NIED claim. "The tort of negligent infliction of emotional distress requires that the plaintiff must have witnessed a negligent injury to a third party." *Benny v. Golling Chrysler*

*Jeep Dodge, Inc.*, No. 304327, 2012 WL 2362723, at *1 (Mich. Ct. App. June 21, 2012) (citations omitted).  Simmons does not allege that she witnessed a negligent injury to a third party.

Nor does Simmons plead facts sufficient to support her negligence and gross negligence claims.  "It is well-established that a prima facie case of negligence requires a plaintiff to prove four elements: duty, breach of that duty, causation, and damages."  *Fultz v. Union-Com. Assocs.*, 470 Mich. 460, 463 (2004).  Simmons alleges that Pelzer-Jones owed her the "standard of ordinary care" and breached that duty by sharing her personal health information.  ECF No. 21, PageID.131.  In her response brief, Simmons states that Pelzer-Jones "should have and ought to have known that her actions and omissions, directly and indirectly…led to and were the proximate cause of [Simmons]…being further physically assaulted and battered by several" HFHS security officers.  ECF No. 75, PageID.871.  Proximate cause under Michigan law is "a logical sequence of cause and effect between the negligence and injury."  *Laney v. Celotex Corp.*, 901 F.2d 1319, 1320 (6th Cir. 1990).  Simmons states no logical connection between Pelzer-Jones's alleged disclosure of private information and the HFHS officers' alleged assault and battery.

22

Lastly, Simmons alleges no facts to support an ELCRA claim against Dr. Pelzer-Jones.  ECF No. 21, PageID.126-127.  To state a claim under the public accommodations provision of ELCRA, Simmons must allege "(1) discrimination based on a protected characteristic (2) by a person, (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations (4) of a place of public accommodation."  *Nuckols v. Grace Centers of Hope*, No. 07-13735, 2007 WL 4454298, at *2 (E.D. Mich. Dec. 14, 2007) (citing *Haynes v. Neshewat*, 477 Mich. 29, 35, 729 N.W.2d 488, 492 (2007)).

Simmons alleges that she is an African American female and that HFHS triage staff discriminated against her and denied her rights by "delay[ing], prevent[ing] and den[ying] [her] access to medical care, the proper medical treatment and diagnostic care and follow-up care on the basis of her gender and race."  ECF No. 21, PageID.125, 127.  She claims that she had to "wait over 2 hours before being seen by a doctor" and the hospital "placed male and non-African American single female patients" in front of her in line.  *Id.*, PageID.127.  But in her ELCRA count, she neither mentions Pelzer-Jones nor alleges discriminatory actions attributable to her.  *Id*.  Simmons does not describe Pelzer-Jones as part of the triage staff.  Instead, Simmons claims that another doctor and nurse saw her first,

and then requested Pelzer-Jones's assistance.  *Id*., PageID.95-97.  Thus, Simmons fails to state a valid ELCRA claim against Pelzer-Jones.

The Court thus recommends that all of Simmons's claims against Pelzer-Jones be dismissed.

## IV.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that the defendants' motion to dismiss time-barred claims, ECF No. 66, be **GRANTED IN PART AND DENIED IN PART**; that defendants' motion to dismiss Pelzer-Jones, ECF No. 68, be **GRANTED**; that defendants' motion to dismiss § 1983 claims, ECF No. 71, be **GRANTED IN PART AND DENIED IN PART**; and that Counts III and XIII be **DISMISSED SUA SPONTE** under 28 U.S.C. § 1915(e).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: February 18, 2022

## NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal

is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991).  And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 18, 2022.

s/Michael Williams
MICHAEL WILLIAMS
Case Manager